UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | 1:21-cr-10250-3-NMG |
| | ) | |
| | ) | |
| AMY RINGLER ROUNTREE | ) | |

**DEFENDANT'S SENTENCING MEMORANDUM**

I. **Introduction**

Amy Rountree is many things. She is a loving partner to her husband. PSR ¶¶ 59-61; Exhibit One. She is a devoted mother to her two children. Id. She is a beloved daughter and sister. PSR ¶ 58; Exhibit One. She is a survivor of an abusive childhood. PSR ¶ 57. Despite that traumatic background, she is a high school and college graduate. PSR ¶ 70. She became a business professional with a long history of employment. PSR ¶¶ 72-77. And now, once this Court imposes its sentence, she will become a convicted felon for the first time. PSR ¶¶ 49-55.

The crime Ms. Rountree committed in this case stands in stark contrast to the way she has lived the rest of her life. Yet she understands her offense and has accepted responsibility for it. The parties have considered all the sentencing factors of 18 U.S.C. § 3553(a), including Ms. Rountree's history and characteristics, the nature and circumstances of the offense, and the correct advisory sentencing guidelines, and come to the same conclusion: that Amy Rountree should be sentenced to time served and one year of supervised release. See Dkt. 241, Plea Agreement, ¶ 5. For all the reasons argued below, Ms. Rountree asks the Court to accept the

1

parties' joint recommendation. Such a sentence, which includes the only arrest of Ms. Rountree's life, the only court supervision in her life, and all the collateral consequences of a first felony conviction, will be "sufficient, but not greater than necessary" to accomplish the goals of sentencing. 18 U.S.C. § 3553(a).

II.     **The correct advisory guidelines range in this case is 0-6 months.**

While the parties agree on a guidelines calculation that results in an advisory range of 0-6 months, the probation department has offered a different calculation that results in a range of 27-33 months. PSR ¶ 84. The sole difference between the calculations is that probation has assessed a 14-point enhancement for a claimed loss of $700,000 under USSG § 2B1.1(b)(1)(H), PSR ¶ 38, while the parties agree that there should be no loss enhancement at all in this case. Dkt. 41, Plea Agreement, ¶ 4; PSR pp. 23-25, Government and Defendant Objections.

The parties agree with all other aspects of probation's calculation of the guidelines. Ms. Rountree's base offense level is 7 because the offense of conviction is referenced to USSG § 2B1.1 and has a statutory maximum term of imprisonment of 20 years or more. PSR ¶ 38. Ms. Rountree would then receive an enhancement for sophisticated means, which raises the offense level to 12 because any case with sophisticated means must have an offense level of at least 12. PSR ¶ 38; USSG § 2B1.1(b)(10). All parties then agree that Ms. Rountree receives a two-point reduction for being a zero-point offender, PSR ¶ 36, and a reduction for acceptance of responsibility. In the parties' calculation the acceptance reduction is two points because the offense level is 12 or less, while in probation's calculation it is three points because the offense level is more than 12. PSR ¶¶ 44, 45; USSG § 3E1.1(b). Thus, the parties' calculation of the offense level is as follows:

2

| | | |
|---|---|---|
| Base Offense Level | § 2B1.1(a)(1) | 7 |
| Sophisticated Means | § 2B1.1(b)(10) | 12 (shall not be less than 12) |
| Acceptance | § 3E1.1(a) | -2 |
| Zero-point offender | § 4C1.1(a)(b) | <u>-2</u> |
| **Total Offense Level** | --- | **8** |

With no prior criminal convictions and a criminal history score of zero, Ms. Rountree falls into Criminal History Category I. Offense Level 8 in Criminal History Category I yields an advisory range of 0-6 months.

Where the parties differ from probation is in the calculation of the "loss" under § 2B1.1(b)(1). The government has clearly stated, and the defense agrees, that there was no loss because there was no actual or intended pecuniary harm. PSR pp. 23, 25, Government and Defendant's Objection 1; USSG § 2B1.1(b)(1), Notes (A)-(C). Probation disagrees with this position. Probation has argued that Ms. Rountree intended the banks to suffer loss because of the difference in fees depending on the category of transaction. PSR p. 24, Probation Officer's Response. Probation also takes the position that the difference in fees resulted in actual loss. Then probation argues that where there is intended and actual loss which cannot be reasonably determined the Court should use gain as an alternative measure. Finally, probation uses the $700,000 that was gained by codefendant Thomas Wells to impose the 14-point enhancement.

The first reason why Thomas Well's gain cannot be used to support a loss enhancement for Ms. Rountree is that she did not receive any of Mr. Wells' gain. The two codefendants stood in completely different positions. Ms. Rountree was an employee of Allied Wallet and earned approximately $4,000.00 per month. PSR ¶¶ 9, 75. In contrast, Mr. Wells was an independent contractor who brought companies to Allied Wallet precisely for the purpose of submitting

3

fraudulent transaction codes to enable those companies to access credit payment mechanisms from which they would have otherwise been excluded. PSR ¶ 11. Wells' gain from these transactions was at least $700,000. PSR ¶ 28. In contrast, Ms. Rountree, as an employee of Allied Wallet, made the same amount of money regardless of whether transactions were coded accurately or inaccurately. It is undisputed that in addition to the fraudulent activity described in the Offense Conduct that Allied Wallet also processed a significant amount of accurate, lawful transactions. Put simply, Ms. Rountree did not gain from the fraud and so gain cannot be used as a measure of loss.

A second reason why gain cannot be used to measure loss in this case is that gain can only be used when there is actual loss. *See* USSG § 2B1.1, App. Note 3(B) ("The court shall use the gain that resulted from the offense as an alternative measure of loss *only if there is a loss* but it reasonably cannot be determined.") (emphasis added). It is not appropriate to use gain as a proxy for loss when there is no evidence of loss. *See, e.g., United States v. Galloway*, 509 F.3d 1246, 1252 (10th Cir. 2007) ("The defendant's gain may be used only as an alternate estimate of that loss; it may not support an enhancement on its own if there is no actual or intended loss to the victims."); *United States v. Hess*, 106 F.4th 1011, 1025 (10th Cir. 2024) ("[t]he government cannot short-circuit the loss calculation by using the gain that resulted from the offense without first attempting to prove actual loss in the first instance") (internal quotations omitted); *United States v. Andersen*, 45 F.3d 217, 221 (7th Cir. 1995) ("gain may be used only as an alternative method of calculation when there is in fact a loss"); *United States v. Chatterji,* 46 F.3d 1336, 1340 (4th Cir. 1995) ("[G]ain is only an alternative measure of some actual, probable, or intended loss; it is not

4

a proxy for loss when there is none."). Simply put, because there was no loss, the Court cannot use "gain" as an alternative measure.

Applying a 14-level loss enhancement in the absence of any loss would be error for another reason. It is the government's burden to prove the applicability of a sentencing enhancement by a preponderance of the evidence. *United States v. Alphas*, 785 F.3d 775, 784 (1st Cir. 2015). Here, the government has made no showing that there was any loss. In fact, it has done the opposite and unequivocally stated that there was no loss. PSR p. 23, Government Objection 1 ("the investigation identified no Guidelines loss to any victim"). It has agreed that a loss enhancement is inapplicable to this case. Id. Where the government makes "no effort to prove the factual basis required to apply this enhancement, and in fact agreed that the enhancement should not be applied," it is error to apply the enhancement. *United States v. Mitchell*, 825 F.3d 422, 425-26 (8th Cir. 2016).

The fraud in this case was the same type as was considered in *United States v. Akhavan*, a case out of the Southern District of New York. In *Akhavan*, the defendants provided false information to banks in order to process credit payments for marijuana even though the banks had a policy not allowing such transactions. *United States v. Akhavan*, 2021 U.S. Dist. LEXIS 163873 (August 30, 2021). The banks were thus tricked into processing more than $150 million in prohibited marijuana transactions. The Court in *Akhavan* found that there was no loss to the victim banks because they were not deprived of any property. *Akhavan* at 16. The Court held that the crime in that case was "a serious fraud that potentially placed the banks at risk; but from the economic standpoint, no one lost money." *Akhavan* at 17. In fact, the banks "made money as a result of this scheme." *Akhavan* at 18. The fraud scheme here is very similar to the one in *Akhavan*.

5

This Court should adopt the same reasoning and conclusion of *Akhavan* and rule that there is no loss enhancement.

### III. The statutory sentencing factors support the jointly recommended sentence.

A. A time served sentence is justified because of the unusual nature and circumstances of the offense.

Even if this Court determines that a 14-point loss enhancement applies in this case, the Court should still accept the jointly recommended time-served sentence based on the sentencing factors of 18 U.S.C. § 3553(a), including the unusual nature and circumstances of the offense. It is undisputed that the $700,000 gain that probation has relied on in assessing the loss enhancement went to codefendant Wells. PSR ¶ 28. Codefendant Khawaja, as the sole owner of Allied Wallet, earned at least as much as Wells. Id. Ms. Rountree, in contrast, did not earn anything extra at all. For this reason alone the offense conduct overrepresents her culpability because she did not receive, or even intend to receive, any personal gain. That is a sufficient reason for a downward variance should the Court adopt probation's guidelines calculation. Ms. Rountree did not intend to enrich herself.

Additionally, Ms. Rountree's history and role at Allied Wallet reveal a somewhat mitigating context for her offense. Although Ms. Rountree eventually became Vice President of Operations, PSR ¶ 9, she certainly did not begin in that position. Ms. Rountree began working at Allied in 2010. PSR ¶ 75. When she started with the company she had an Associate's Degree in Business Administration. PSR ¶ 70. She also had relatively little experience, having previously worked as a junior web designer and a closing supervisor for a bank. PSR ¶¶ 76, 77.

The government has disclosed how senior Allied officers established the fraud and later trained Ms. Rountree how to commit it. PSR p. 24, Government Objection #2. She herself did not have professional or managerial discretion that contributed to the offense. Id. Ms. Rountree was thus told, by those with authority over her, that this fraud scheme was the way that things were done at Allied Wallet. This fact is not offered as an excuse. Ms. Rountree has acknowledged that she willingly participated in the fraud and has admitted her guilt. Yet the facts that she was not a leader in the fraud but instead answered to others is another way in which her culpability is overrepresented, which in turn justifies a downward variance.

To be clear, the right, lawful decision for Amy Rountree would have been to decline to participate in the scheme. But that also would have meant leaving her job since the sole owner of the company was the ringleader. As described in the offense conduct, Ms. Rountree's participation in the offense was from approximately 2013 through 2018. See PSR ¶¶ 16-25. At that time in her life she was working very hard to keep her family together. PSR ¶ 59. Her first son was born in 2010 and her second in 2017. Id. During this same general period her husband experienced significant personal difficulty that placed even more responsibility on her. Id. Her husband's struggles also caused financial strain for the family. Id. Withdrawing from the scheme by leaving her job would have involved further risk to her family. Ms. Rountree regrets that she did not make the right decision and put in the work to find a new job. This very specific context, however, shows that Ms. Rountree does not present a risk of recidivism. Outside of the context of being trained to commit fraud during a vulnerable period in her life, she never would have committed this crime. This is yet another reason why the nature and circumstances of the offense support the joint request for a time served sentence.

B. <u>Amy Rountree's history and characteristics clearly show that the goals of sentencing can be accomplished through a time served sentence.</u>

Amy Rountree is 42 years old. Apart from the specific context of this case, she has never even been accused of a crime. PSR ¶¶ 49-55. Her life of law-abiding behavior is notable considering the trauma she experienced as a child.

Ms. Rountree's parents divorced when she was two years old. PSR ¶ 57. From that point until she was nine, she and her younger sister went back and forth between her parents' houses. Id. Tragically, both of them were physically abused by their stepmother. Id. Their father objected, but never stopped it and from the children's perspective he allowed it to happen. Id. As the older sister, Amy took on the role of caretaker and tried to protect her sister, even though she herself was still just a young child. Id. Eventually the abuse became so severe that their mother became aware and took full custody of the girls. Id. From that point Ms. Rountree never lived with her father again and their relationship has never been good. Id.

Although the abuse stopped after leaving her stepmother, Amy Rountree experienced other traumas during her childhood. A close friend of hers committed suicide when she was a teenager. PSR ¶ 66. As she was entering her senior year of high school, her mother moved out of state to pursue better personal opportunities. PSR ¶ 57. Ms. Rountree was able to finish high school by staying with her grandparents in her hometown, but the separation from her mother was difficult at that age.

Given the trauma and instability in her childhood, it is not surprising that Ms. Rountree began using substances at a very early age. PSR ¶ 68. By the time she was 13 she was drinking and using marijuana. Id. She used LSD and mushrooms at age 14. Id. These are clear indicators of a possible

downward trajectory that could have led to more severe use, dropping out of school, and ultimately chronic criminal offending.

Yet none of that happened for Amy Rountree. She stayed in school, graduated, and went on to earn a college degree. PSR ¶ 70. She got her substance use under control and it never progressed to an addiction. PSR ¶¶ 68, 69. She has worked her entire adult life. PSR ¶¶ 72-77. She has provided her children with a much more stable life than she herself received as a child. PSR ¶¶ 57-61. Amy Rountree is a success story.

Clearly Amy Rountree did not overcome her traumatic childhood on her own. She benefited from the love and support of an extended family, including her grandparents, mother, and sister. Those are four of the people who provided the response to trauma that she needed. They showed her the example of how to be a productive member of society despite trauma. They are also four of the 11 people who have written glowing letters of support attesting to her character. Exhibit One. Others include her stepfather, friends, coworkers, and in-laws. Id. The 11 letters universally describe a woman who is committed to her children above all else. Id. They also describe how she has been the one to keep her family afloat and together during difficult circumstances. Id. All of this consistent evidence of Amy Rountree's excellent character provides further support for the jointly recommended sentence.

C. <u>Ms. Rountree will suffer collateral consequences of her conviction that accomplish sentencing goals such as deterrence and just punishment</u>.

Even without a period of incarceration, this case has resulted in significant consequences for Ms. Rountree. She is now, for the first time, a convicted felon. The collateral consequences of a

9

felony conviction are significant and numerous. See *United States v. Nesbeth*, E.D.N.Y., 1:15-cr-00018, Block, J., Dkt. 43 (imposing probation for importation of 602 grams of cocaine in light of the number and severity of collateral consequences for a felony conviction). She will suffer the loss of important civil rights. Her future employment opportunities will be greatly narrowed. All of these consequences achieve both deterrence and just punishment even without incarceration.

This case has affected Ms. Rountree deeply. The more than three years since she was arrested have been the hardest years of her life. PSR ¶ 65. That assessment says a lot given the hardship she endured as a child. Yet it is understandable since her primary concern during this time has been that she will be separated from her children. Id. She has been concerned not just for herself, but even more so for her family.

Her concern for how her children would be affected should she be incarcerated is justified. The National Institute of Justice, a branch of the Department of Justice, cites research that has "established that a parent's incarceration poses several threats to a child's emotional, physical, educational, and financial well-being." National Institute of Justice, *Hidden Consequences: The Impact of Incarceration of Dependent Children*, by Eric Martin, NIJ No. 278, March 1. 2017, available at: https://nij.ojp.gov/topics/articles/hidden-consequences-impact-incarceration-dependent-children#. These threats include increased risks of incarceration, psychological problems, and antisocial behavior, and worse outcomes in lower educational attainment and economic well-being. *Id*. One district court has pointedly summarized the terrible effects of parental incarceration:

> In particular, this latter research [on parental incarceration] has revealed that children with an incarcerated parent are 3 to 4 times more likely than those without an incarcerated parent to engage in delinquent behavior, and 2.5 times more likely to

> experience mental health problems. When looking at long-term effects, children of incarcerated parents are more likely to have substance abuse problems and to be unemployed, and to experience poor romantic relationships, divorce, and/or separation from their own children. In the wake of parental incarceration, family members must deal with the sequela of traumatic separation, loneliness, stigma; how to explain the separation to children, strained parenting, reduced family income, unstable childcare arrangements, and home and school instability and transitions."

*United States v. Aguilar*, 133 F. Supp. 3d 468, 477 (E.D.N.Y. 2015) (quoting Brabeck, et al., *The Psychosocial Impact of Detention and Deportation on U.S. Migrant Children and Families*, 84 Am. J. of Orthopsychiatry 496, 499-500 (2014).

Amy Rountree has and will continue to experience punishment. Any person who is made aware of all the serious collateral consequences she has suffered would certainly be deterred from committing a crime.

The parties agree that incarceration is not a necessary element of the sentence in this case. Indeed, the Supreme Court has recognized that probation is a significant sentence:

> We recognize that custodial sentences are qualitatively more severe than probationary sentences of equivalent terms. Offenders on probation are nonetheless subject to several standard conditions that substantially restrict their liberty. Probationers may not leave the judicial district, move, or change jobs without notifying, and in some cases receiving permission from, their probation officer or the court. They must report regularly to their probation officer, permit unannounced visits to their homes, refrain from associating with any person convicted of a felony, and refrain from excessive drinking. Most probationers are also subject to individual 'special conditions' imposed by the court.

*Gall v. United States*, 552 U.S. 38, 48-49 (2007).

The Court has evidence to justify confidence that should it impose the agreed-upon sentence that Ms. Rountree will successfully complete the recommended term of supervised release and never offend again. She has fully abided her conditions for more than three years while this case was pending. PSR ¶ 4. She also has never committed a crime outside of the

11

specific circumstances of this case. Ms. Rountree's ability and desire to follow the law show that the recommended sentence will accomplish the goals of sentencing.

IV. **Conclusion**

As argued above, the parties agree that the advisory guidelines in this case support the jointly recommended sentence of time served and one year of supervised release. Even if the Court reaches a different conclusion as to the guidelines, the recommended sentence is still fully supported by the sentencing factors of 18 U.S.C. § 3553(a). Amy Rountree poses no threat to the public nor any risk of recidivism. She has been and will continue to be punished and deterred through the various and significant collateral consequences in this case. All the information before the Court shows that she feels true remorse and shame. Any rehabilitation she needed has been accomplished. For all the reasons argued above, Ms. Rountree asks the Court to impose a sentence of time served and one year of supervised release.

> Respectfully submitted,
> AMY RINGLER ROUNTREE
> by her attorney
> */s/ Joshua Hanye*
> Joshua Hanye, BBO#661686
> FEDERAL PUBLIC DEFENDER OFFICE
> 51 Sleeper Street, 5th Floor
> Boston, MA 02210
> 617-223-8061

**Certificate of Service**

      I, Joshua R. Hanye, hereby certify that this document was this day filed through the ECF system and will be sent electronically to the registered participants as Identified on the Notice of Electronic Filing ("NEF").

Date: <u>December 6, 2024</u>                          */s/ Joshua R. Hanye*
                                                                Joshua R. Hanye